UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OIL TANKER – "GRACE 1" (IMO 9116412) | )  Civil Action No. _____ |
| | ) |
| - and - | ) |
| | ) |
| ALL PETROLEUM ABOARD OIL | ) |
| TANKER – "GRACE 1" (IMO 9116412) | ) |
| | ) |
| Defendants. | ) |

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney for the District of Columbia, which brings this verified complaint for forfeiture in a civil action *in rem* against the defendant properties, namely: Oil Tanker *Grace 1*, bearing International Maritime Organization (IMO) Number 9116412 ("*Grace 1*") and All Petroleum Aboard Oil Tanker *Grace 1* (collectively the "Defendant Properties"); and alleges as follows.

## NATURE OF ACTION AND THE DEFENDANT IN REM

1.    This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI") and Homeland Security Investigations ("HSI"). Specifically, the United States is investigating the unlawful use of the U.S. financial system to support and finance Iran's transport and sale of oil products.

2.    The Defendant Properties are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to violations of the

International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*, and the bank fraud statute, codified at 18 U.S.C. § 1344. The Defendant Properties are also subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering transactions, in violation of 18 U.S.C. § 1956, and as property traceable to such property. A photograph of the *Grace 1* is attached hereto as Exhibit A.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4. Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia. The coconspirators (identified below) failed to seek the requisite licenses from the Office of Foreign Asset Controls ("OFAC"), which is located in Washington, D.C.

5. Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2), because the property subject to forfeiture is located in a foreign country.

## FACTS GIVING RISE TO FORFEITURE

### I.    BACKGROUND

#### A.    IEEPA and the ITSR

6. This civil forfeiture action relates to violations of regulations and Executive Orders issued pursuant to IEEPA. Enacted in 1977, IEEPA gives the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title." 50 U.S.C. § 1705(a).

-2-

7.    Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

8.    On March 15 and May 6, 1995, the President issued Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013, the Iranian Transactions and Sanctions Regulations, the "ITSR") implementing the sanctions imposed by the Executive Orders.

9.    The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States Person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC.

10.    The ITSR also prohibits the supply of services where the benefit of such services is otherwise received in Iran, if such services are performed in the United States. *See* 31 C.F.R. § 560.410.

- 3 -

11.     The ITSR provides that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. *See* 31 C.F.R. § 560.427(a).

12.     The ITSR further prohibits transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR.  31 C.F.R. § 560.203.

13.     Additionally, on August 6, 2018, the President, pursuant to IEEPA, issued Executive Order 13846, which, among other things, authorized the Secretary of State, in consultation with the secretaries of various other executive agencies, to impose sanctions on individuals who knowingly engage in a significant transaction for the purchase, acquisition, sale, transport, or marketing of oil or petroleum products from Iran.

14.     After this Executive Order was implemented, the Iranian Oil Minister, Bijan Namdar Zanganeh, said in an interview, "We have unofficial or unconventional sales, all of which are secret, because if they are made known America would immediately stop them."

15.     Law enforcement has uncovered evidence showing that oil tanker *Grace 1* has been involved with the type of the secret, unconventional sales, which the Iranian Oil Minister referenced.   Law enforcement has also discovered that, in addition to transferring Iranian petroleum, the *Grace 1* may have used fraudulent documents when conducting this activity. Moreover, financial records show that U.S. dollar wires were sent through the United States financial system for the benefit of the *Grace 1* near the time of illicit transfers by the *Grace 1*.

**B.     Background and GPS Analysis of Oil Tanker *Grace 1***

16.     This civil forfeiture action arises from a scheme to unlawfully access the U.S. financial system to support illicit shipments to and from Iran.  The scheme involves multiple parties

- 4 -

affiliated with the Government of Iran and furthered by the deceptive voyages of the *Grace 1* from Iran to other locations.

17.     The *Grace 1* is a large oil tanker capable of carrying 2,127,146 barrels (approximately 290,000 metric tons) of crude oil. Such vessels are required to use the automatic identification system (AIS). AIS was developed in the 1990s as a maritime safety feature which exchanges vessel information electronically with other nearby ships. The system is used by marine navigation officers and other maritime authorities for collision avoidance, identification and vessel locational data. Shipboard AIS became a requirement based on the International Maritime Organization's International Convention for the Safety of Life at Sea on the vessels such as *Grace 1* as of December 31, 2004.

18.     AIS acts like a transponder that transmits ship's location information (based on GPS) via a VHF radio. AIS is a safety feature that notifies other vessels of a vessel's location. Oil tankers over a specified gross tonnage are required to keep AIS on when a tanker is at sea, partly due to the environmental damage oil tankers can cause by oil spills. AIS also measures how deep a vessel sits on the water, which is known as its "draft."

19.     Many tankers operating on behalf of sanctioned entities turn this safety system off. In particular, this is a common practice when doing business with Syria and Iran, which are both subject to similar United States sanctions.

### *The Grace 1's Ties to Iran*

20.     The *Grace 1* has made multiple calls to the Iranian ports of Asaluyeh and Kharg Island, which are located near Iranian oil fields and are used to load oil onto tankers.

21.     From March through July 2017, the *Grace 1* was captained by an Iranian citizen. That Iranian Citizen has maintained employment with the National Iranian Tanker Company

(NITC) since December 14, 2009.  In July 2012, OFAC imposed sanctions on the NITC, identifying the NITC as a Government of Iran entity.

22.     Based on AIS data of *Grace 1*, including the draft information measuring how deep the ship sits on the water, there are at least three instances of the *Grace 1* loading petroleum products in Iran and multiple instances of smaller tankers engaging in ship-to-ship transfers with the *Grace 1* after it loaded Iranian oil.

### December 2018 Transfer of Iranian Crude Oil

23.     AIS data revealed that the *Grace 1* loitered at the western end of the Persian Gulf near the Iran/Iraq border from on or about November 1 through on or about November 30, 2018. The tanker deactivated its AIS as it travelled towards the Iranian port of Asaluyeh, which is a location where oil tankers are known to load and unload petroleum. The tanker's AIS remained off until December 15, 2018.  When the AIS resumed functioning, the draft of the *Grace 1* was consistent with oil being loaded while the AIS was turned off.

24.     The *Kriti Island* is an oil tanker capable of holding 1,077,313 barrels (approximately 147,000 metric tons) of crude oil, which is approximately half the capacity of the *Grace 1*.  AIS data shows that the *Kriti Island* was collocated with the *Grace 1* on January 16, 2019, in the Gulf of Oman.  On or about on January 16, 2019, the *Grace 1* conducted a ship-to-ship transfer with the *Kriti Island*.

25.     The *Marshal Z* is an oil tanker capable of holding 1,034,405 barrels (approximately 141,000 metric tons) of crude oil, which is approximately half the capacity of the *Grace 1*.  This oil tanker has been on an OFAC advisory for oil tankers that have engaged in ship-to-ship transfers of petroleum destined for Syria since March, 2019.  *See* March 25, 2019 OFAC Advisory: "Sanctions Risks Related to Petroleum Shipments involving Iran and Syria."  AIS data shows that

the *Marshal Z* was collocated with the *Grace 1* on January 22, 2019, in the Gulf of Oman.  On or about on January 22, 2019, the *Grace 1* conducted a ship-to-ship transfer with the *Marshal Z*.  Shortly thereafter, the *Marshal Z* engaged in another ship-to-ship transfer.

26.     As to this voyage, the *Grace 1* filed and possessed documents stating the ship had left the Iraqi shipping port, Basra Oil Terminal; however, the shipping documents were forged, and part of a scheme to conceal the Iranian origin of the oil.

### Payments Referencing the Grace 1 at Time of the Grace 1's December 2018 Port Call in Iran and January 2019 Ship-to-Ship Transfers

27.     On or about December 20, 2018, Company 3 in Saint Kitts and Nevis sent \$4 million to Company 1, which payment routed through the United States.  This payment referenced the *Grace 1* and an offshore oil rig.

28.     Company 1 is located at the same address in Saint Kitts and Nevis as an oil procurement company sanctioned by OFAC for shipping petroleum to Syria.

29.     Saint Kitts and Nevis has no connection to the *Grace 1* and is a "Jurisdiction of Primary Concern" for Money Laundering according to annual reporting produced by the U.S. Department of State.

30.     The companies involved with these transactions were being used as cutouts to avoid listing the ultimate senders and beneficiaries on these U.S. dollar transactions.

31.     On or about December 26, 2018, Company 2, which is based in the U.A.E., wired \$1.3 million to Company 3, which payment routed through the United States.  This payment referenced the *Grace 1* and an offshore oil rig.

32.     Person 1 and Person 2 have an ownership interest in Company 3.

33.     Person 1 and Person 2 also have an ownership interest in Company 4, another St. Kitts and Nevis-based company.  Between on or about January 14 and 17, 2019, which was when

- 7 -

the *Grace 1* conducted the ship-to-ship transfers with the *Kriti Island*, Company 5 wired Company 4 approximately $7,145,286.32, which funds transited the U.S. financial system.

34.     On or about January 29, 2019, Company 5 also wired $495,021.00 for the *Kriti Island* to transfer oil from the *Grace 1*.  The purposes of this payment was "Trade" which was the same instruction that Company 5 used when sending Company 4 funds on or about January 14, 2019.  These funds were similarly wired through the United States.

35.     Thus, at least $13,064,183.69 traceable to the *Grace 1*'s illicit shipment of Iranian oil in December 2018 and subsequent ship-to-ship transfers of this oil in January 2019, illegally transited the U.S. financial system.

## C.     Connection to Iranian Entities

36.     The *Grace 1* has a complex ownership structure.  It is owned, managed, and crewed by separate companies that appear to be operating on behalf of other parties.

37.     Publicly available sources of information show multiple different possible owners of the *Grace 1*.  One such source revealed that it is owned by Company 6, which lists a P.O. Box for its address and is operated by a U.A.E. subsidiary of an oil company, which is part of an oil company that is headquartered in Iran.

38.     Company 7, which is located in Singapore, is the manager of the *Grace 1*.  In 2016, Company 7 made at least six U.S. dollar payments that referenced the *Grace 1* totaling $34,108.79 to a U.S. company.

39.     Company 7's accounting manager is also the accounting manager for a company that has publicly associated itself with the Al-Aqili Group.  OFAC imposed sanctions on the Al-Aqili Group on April 29, 2014, for providing support in connection with deceptive oil deals for Iran and for assisting Iran in selling oil in evasion of sanctions.  The Al Aqili Group arranged oil

sales for the Islamic Revolutionary Guard Corps ("IRGC") and facilitated the circumvention of oil sanctions by disguising the oil's origin.

40.    Entity 1 provides the crew for the *Grace 1*. Entity 1 is made up of a group of companies based in India, the United Arab Emirates, and Singapore.

41.    Entity 1 and its affiliated entities are also owners and directors of a number of related companies, including Company 8. Company 8 was previously the technical manager for the *Grace 1*. Company 8 is also the current operator and ship manager of an oil tanker that OFAC previously designated for its connection to Iran, and which unloaded Iranian oil at Syria on multiple occasions in 2016 and 2017.

42.    A confidential source revealed that the *Grace 1* is involved in IRGC oil shipments.

### *Grace 1's Current Shipment of Iranian Oil Traceable to U.S. Dollar Transaction*

43.    AIS data revealed that the Grace 1's transponder turned off from on or about April 8 to 16, 2019 as it traveled towards Iran while in the Persian Gulf. The Grace 1 received Iranian oil from Kharg Island, Iran, on or about April 8 to 17, 2019. The Grace 1's transponder became operational again on or about April 17, 2019 as the tanker departed Kharg Island. The Grace 1 then traveled around Africa, and was west of Morocco as of on or about July 2, 2019.

44.    Entity 1 crews the *Grace 1*. Two of the companies that are members of the Entity 1 are Company 8 and Company 9. Company 8 was the Technical Manager of the *Grace 1*.

45.    On or about April 24, 2019, Company 9 sent Company 8 $169,970.00 as a payment for crew management, which payment transited through the United States. At this time, the *Grace 1*'s crew was facilitating the transportation of Iranian oil.

46.    A confidential source revealed that the *Grace 1* (IMO 9116412) is scheduled to arrive in Syria in early July.

## COUNT ONE – FORFEITURE
### (18 U.S.C. § 981(A)(1)(C))

47.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 46 above as if fully set forth herein.

48.     Persons known and unknown acted individually and conspired together to cause and conduct the above identified illegal payments and financial services, which benefitted Iran, in violation of IEEPA, specifically 50 U.S.C. § 1705 *et seq.* and the conspiracy statute, 18 U.S.C. § 371.

49.     As such, the Defendant Properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a substantive IEEPA offense and conspiracy to violate IEEPA.

## COUNT TWO – FORFEITURE
### (18 U.S.C. § 981(A)(1)(C))

50.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 46 above as if fully set forth herein.

51.     Persons known and unknown acted individually and conspired together to conduct the above identified illegal payments using shell companies and other tactics to conceal beneficial owners and ties to Iran as part of a scheme or artifice to defraud a U.S. bank and/or to obtain any of the money, funds, or other property owned by, or under the custody or control of, a U.S. bank by means of false or fraudulent pretenses, representations, or promises, in violation of the bank fraud statute, specifically 18 U.S.C. § 1344, and the conspiracy statute, 18 U.S.C. § 1349.

52.     As such, the Defendant Properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a substantive and conspiracy to violate the bank fraud statute.

## COUNT THREE -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(A))

53.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 46 above as if fully set forth herein.

54.     Persons known and unknown acted individually and conspired together to transmit and transfer funds related to the Defendant Properties from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of violations of the penalties of IEEPA and the bank fraud statute, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A).

55.     As such, the Defendant Properties are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. § 1956(h), 1956(a)(2)(A), or as any property traceable to such property.

*     *     *

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that notice issue on the Defendant Properties as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the Defendant Properties be forfeited to the United States for disposition according to law; and that the United States be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: July 3, 2019
Washington, D.C.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar Number 472-845

By:     /s/
ZIA M. FARUQUI, D.C. Bar No. 494990
BRIAN P. HUDAK, NY Bar
Assistant United States Attorneys
555 Fourth Street, NW
Washington, DC 20530
(202) 252-7566 (main line)

*Attorneys for the United States of America*

- 12 -

**<u>VERIFICATION</u>**

I, Thomas Tamsi, a Special Agent with the Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 3rd day of July, 2019.

_____/s/_____

Special Agent Thomas Tamsi
Homeland Security Investigations

I, Cindy Burnham, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 3rd day of July, 2019.

_____/s/_____

Special Agent Cindy Burnham
Federal Bureau of Investigation

# Attachment A

## OIL TANKER – "GRACE 1" (IMO 9116412)

