UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OIL TANKER BEARING INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER 9116412, A/K/A "*ADRIAN DARYA 1*," F/K/A "*GRACE 1*,"<br><br>ALL PETROLEUM WHICH IS OR WAS ONBOARD OIL TANKER BEARING INTERNATIONAL MARITIME ORGANIZATION (IMO) NUMBER 9116412 AS PART OF APRIL 2019 SHIPMENT,<br><br>- and -<br><br>$999,950.00 AT U.S. BANK 1 ASSOCIATED WITH PARADISE GLOBAL TRADING LLC<br><br>Defendants. | Civil Action No. 1:19-cv-1989 (JEB) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT JUDGMENT AS TO DEFENDANT PROPERTIES**

The United States has brought an *in rem* action against the defendant properties, namely: (1) Oil Tanker Bearing International Maritime Organization ("IMO") Number 9116412, a/k/a "Adrian Darya 1," f/k/a "Grace 1" ("Defendant Property 1"); (2) All Petroleum Which Is or Was Onboard Oil Tanker Bearing IMO Number 9116412 As Part of April 2019 Shipment ("Defendant Property 2"); and (3) $999,950.00 at U.S. Bank 1 Associated with Paradise Global Trading LLC ("Defendant Property 3") (collectively the "Defendant Properties"). The United States filed this action pursuant to and 18 U.S.C. § 981(a) and in accordance with Rule G(2) of the Federal Rules

of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules").  Default was entered against the Defendant Properties on May 22, 2020.  This matter is now ripe for entry of a default judgment; specifically, the United States requests forfeiture of the Defendant Properties.

## FACTUAL BACKGROUND

### I.   Background

#### A.   the Islamic Revolutionary Guard Corps ("IRGC")

On October 25, 2007, the Department of State and the Department of the Treasury designated IRGC pursuant to Executive Order No. 13382 in connection with its support to Iran's ballistic missile and nuclear programs.  The Treasury designation stated:

> Considered the military vanguard of Iran, the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary Guard Corps) is composed of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations) in addition to a counterintelligence directorate and representatives of the Supreme Leader. It runs prisons, and has numerous economic interests involving defense production, construction, and the oil industry. Several of the IRGC's leaders have been sanctioned under UN Security Council Resolution 1747.
>
> The IRGC has been outspoken about its willingness to proliferate ballistic missiles capable of carrying [weapons of mass destruction ("WMD")]. The IRGC's ballistic missile inventory includes missiles, which could be modified to deliver WMD. The IRGC is one of the primary regime organizations tied to developing and testing the Shahab-3. The IRGC attempted, as recently as 2006, to procure sophisticated and costly equipment that could be used to support Iran's ballistic missile and nuclear programs.

https://www.treasury.gov/press-center/press-releases/pages/hp644.aspx.

On April 8, 2019, the President designated the IRGC as a Foreign Terrorist Organization. The designation noted that the IRGC actively finances and promotes terrorism.  On April 15, 2019, the Secretary of State designated the IRGC, including the IRGC-QF, as Foreign Terrorist Organization.  *See* https://www.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

According to the Department of the Treasury, the IRGC and its major holdings have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the oil industry and the profits from these activities support the IRGC's full range of nefarious activities, including the proliferation of WMD and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad. *See* https://home.treasury.gov/news/press-releases/sm703.

On January 23, 2020, the Department of Treasury's Office of Foreign Assets Control (OFAC) described the National Iranian Oil Company (NIOC) as "an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies. Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East."  The U.S. Department of the Treasury previously submitted a report to Congress, as required by the Iran Threat Reduction and Syria Human Rights Act of 2012, stating that the Department of the Treasury determined that NIOC was an agent or affiliate of the IRGC.

### B.     Petroleum as a Source of Influence for the IRGC

OFAC has noted that crude oil and condensate sold by the IRGC-QF originates with NIOC, and that the IRGC-QF relies on persons embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things. Furthermore, National Iranian Tanker Company (NITC) vessels have been used in IRGC-QF-run operations.  *See* https://home.treasury.gov/news/press-releases/sm767.

The Department of the Treasury further noted that under the current Iranian regime, the IRGC's influence has grown within NIOC.  For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of

Petroleum.   Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC.  Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.  *See* https://ir.usembassy.gov/our-relationship/official-reports/treasury-report-nioc-nitc/

Since September 2018, the IRGC-QF has moved oil through a sanctioned shipping network, "which features dozens of ship managers, vessels, and facilitators." https://home.treasury.gov/news/press-releases/sm767.  "This complex network of intermediaries enables the IRGC-QF to obfuscate its involvement in selling Iranian oil." *Id.*

OFAC has concluded that in spring 2019 alone, one IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil.  *Id.*  These shipments, taken collectively, sold for more than half a billion dollars.  *Id.*  The same network also sold nearly 4 million barrels of condensate and hundreds of thousands of barrels in gas oil, bringing in another quarter billion dollars.  *Id.*

## II.     The Defendant Properties

### A.   Voyage of Defendant Property 1 and Defendant Property 2

Defendant Property 1 was previously flagged in Panama.  During the pendency of this investigation, Defendant Property 1 changed to an Iranian-flagged vessel.  Defendant Property 1 is a large oil tanker capable of carrying 2,127,146 barrels (approximately 290,000 metric tons) of crude oil.  Defendant Property 2 is approximately 2.1 million barrels of crude oil that was previously aboard Defendant Property 1.

Defendant Property 1 had a complex ownership structure.  It was owned, managed, and crewed by separate companies that operated on behalf of other parties.  For example, Iships

Management Pte Ltd ("Iships"), a company located in Singapore, was the manager of Defendant Property 1.  Iships employee communications revealed that it was part of a group of companies named the Avantgarde Group, which received payments from Mohammad Saeed Al Aqili and the Al Aqili Group.  On April 29, 2014, OFAC designated Mohammad Saeed Al Aqili and the Al Aqili Group, for assisting the Iranian regime in selling oil in evasion of U.S. trade/economic sanctions.  OFAC noted in the designation that the Al Aqili Group arranged oil sales for the IRGC.

Iships was also directly affiliated with the National Iranian Oil Company ("NIOC"), an OFAC designated entity.  On September 24, 2012, an OFAC press release discussing NIOC stated:

> Under the current Iranian regime, the IRGC's influence has grown within NIOC.  For example, on August 3, 2011, Iran's parliament approved the appointment of **Rostam Qasemi, a Brigadier General in the IRGC**, as Minister of Petroleum.  Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC.  Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.  As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbia has obtained billions of dollars worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.

https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx (emphasis added).  Here, Rostam Qasemi's involvement in this scheme, included facilitating payments involving the Defendant Properties.

After Gibraltarian authorities seized Defendant Property 1, the IRGC Deputy Commander Rear Admiral Ali Fadavi, publicly stated on July 11, 2019, "we [IRGC] had rented the ship and we [IRGC] carried the cargo." https://www.reuters.com/article/us-mideast-iran-britain-guards-idUSKCN1U615B.  On August 21, 2019, Iran's semi-official news agency said that Defendant Property 1 was currently leased to the IRGC.  This comment came in an interview with the head of IRGC's navy, Alireza Tangsiri.  *See* https://af.reuters.com/article/commoditiesNews/idAFL5N25H0R9.  Iranian news subsequently retracted this statement. *See id.*

In or about April 2019, Defendant Property 1 traveled in the Arabian Gulf toward Iran. During this period, Defendant Property 1 received Iranian oil (Defendant Property 2) from Kharg Island, Iran.  Defendant Property 1's transponder became operational on or about April 17, 2019, as it departed Kharg Island with Iranian oil.  Defendant Property 1 then traveled around Africa.

On or about July 4, 2019, the British Royal Marines and authorities in Gibraltar detained the Defendant Property 1 and Defendant Property 2.  On or about July 11, 2019, the Royal Gibraltar Police arrested the captain and chief officer of Defendant Property 1 for sanctions violations, however, these individuals and Defendant Property 1 and Defendant Property 2 were ultimately released from Gibraltarian custody on or about August 16, 2019.  Gibraltar authorities lawfully obtained charts and electronic equipment from Defendant Property 1, WhatsApp messages from crewmembers' mobile devices, and crewmembers' statements, which all revealed that Defendant Property 1 and Defendant Property 2 were destined for Port Banias, Syria.  Gibraltarian authorities ultimately released Defendant Property 1 and Defendant Property 2.

On August 30, 2019, OFAC identified Defendant Property 1 and Defendant Property 2 as blocked properties, because of their nexus to the IRGC-QF.  Under Secretary for Terrorism and Financial Intelligence Sigal Mandelker stated, "Vessels like the [Defendant Property 1] enable the IRGC-QF to ship and transfer large volumes of oil, which they attempt to mask and sell illicitly to fund the regime's malign activities and propagate terrorism." https://home.treasury.gov/news/press-releases/sm765.

B.  Paradise Global Launders Defendant Property 3 as Part of this Scheme

The Al Aqili / Avantgarde Group used Paradise Global, a U.A.E.-based front company, as a payment intermediary as part of the scheme, including for petroleum tankers operated by Iships,

such as Defendant Property 1.  A commercial company database shows that Paradise Global is partially owned by a member of the Al Aqili Group.

There were numerous instances of Paradise Global coordinating payments with other Avantgarde Group companies, including for Defendant Property 1, for example:

    a. On July 8, 2014, the managing director of Paradise Global was copied on an email between a NIOC agent, and an Iships employee;

    b. On August 31, 2014, Paradise Global, a NIOC agent, and other Avantgarde affiliated employees discussed the crew of Defendant Property 1;

    c. On November 28, 2014, Paradise Global paid U.S. Company 2 for insurance premiums associated with Iships operated petroleum tanker Bonita Queen;

    d. On February 3, 2015, an Oman-based front company (Oman Company 1) wired $699,975.00 to Paradise Global, which funds OFAC blocked while transiting through a U.S. correspondent bank account (U.S. Bank 1) and represent a portion of Defendant Property 3;

    e. On February 4, 2015, Oman Company 1 wired Paradise Global another $299,975.00, which OFAC also blocked while transiting through U.S. Bank 1, which represent the other portion of Defendant Property 3; and

    f. On July 26, 2015, an Avantgarde Group / Iships employee sent a check from Paradise Global to Iships relating to Defendant Property 1.

## PROCEDURAL HISTORY

On July 3, 2019, the United States commenced this forfeiture action *in rem* against the Defendant Properties by filing a verified complaint for forfeiture.  *See* ECF No. 1.  On August 16, 2019, the United States filed a verified amended complaint for forfeiture.  *See* ECF No. 7. On

August 30, 2019, the United States filed a verified second amended complaint for forfeiture.  *See* ECF No. 14.

On August 30, 2019, this Court made a probable cause finding and issued a Warrant for Arrest *In Rem* for the Defendant Properties.  *See* ECF 16.

On October 16, 2019, the United States commenced notification of this forfeiture action via publication on an internet site, http://www.forfeiture.gov, for 30 consecutive days.[1]  Claims based on publication were due by December 16, 2019.  See Fed. R. Civ. P. Supp. R. G(5)(a)(ii)(B); Notice of Publication (ECF 25).  The time to file a claim based on publication has expired.  *See* Affidavit for Default (ECF 26).

On November 14, 2019, a verified claim was filed by Jeremy Levin and Lucille Levin. *See* ECF No. 18.  On May 18, 2020, Jeremy Levin and Lucille Levin filed a notice of withdrawal of their verified claim. *See* ECF No. 24.

In addition to this public notice, the United States identified potential claimants as to the Defendant Properties.[2]  Direct notice was not possible as to the owner of Defendant Property 1 and Defendant Property 2, as the potential claimant was an Iranian government entity.  As to Defendant Property 3, there was no person who reasonably appeared to be a potential claimant.

---

[1] The Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") govern civil forfeiture actions *in rem* arising from a federal statute. *See* Supplemental Rule A(1)(B). The Federal Rules of Civil Procedure also apply, except to the extent they are inconsistent with the Supplemental Rules. *See* Supp. Rule A(2). Supplemental Rule G(4) governs the process by which the government must serve notice of the Complaint. Notice is required to the public via publication, as well as to potential claimants via direct notice.  Supp. Rule G(4).

[2] Supplemental Rule G also requires that the government send direct notice "to any person who reasonably appears to be a potential claimant on the facts known to the government." Supp. Rule G(4)(b)(i).

The funds were frozen by an intermediary bank that has expressed no interest in contesting the forfeiture.

On May 22, 2020, the Clerk of the Court entered default as to the Defendant Properties. *See* Clerk's Entry of Default as to *In Rem* Defendants (ECF 27).  This matter is now ripe for entry of default judgment against the Defendant Properties.

## STANDARDS FOR ENTRY OF DEFAULT JUDGMENT

In cases where the claim is not for a "sum certain" or a sum that can be computed with certainty, the party seeking a default judgment must apply to the court. *See* Fed. R. Civ. P. 55(b)(2); *see also Canady v. Erbe Elektromedizin GMBH*, 307 F. Supp. 2d 2, 8-9 (D.D.C. 2004); *United States v. Gant*, 268 F. Supp. 2d 29, 32 (D.D.C. 2003). The court has the power to enter default judgment "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Fed. R. Civ. P. 55(a); *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass, LLC*, 635 F. Supp. 2d 21, 23 (D.D.C. 2009) (citing *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 375 n. 5 (D.C. Cir.1980)). This authority applies equally in the context of a civil forfeiture action. *See, e.g., United States v. $23,000 in U.S. Currency*, 356 F.3d 157, 163 (1st Cir. 2004) (Rule 55 applies equally in the civil forfeiture context); *United States v. $6,500.00 in U.S. Currency*, No. 1:10-cv-327, 2010 WL 4365886, at *1 (E.D. Tex. Nov. 2, 2010), *report & recommendation adopted sub nom. United States v. & 6,500.00 in U.S. Currency*, No. 1:10-CV-327, 2010 WL 4365890, at *1 (E.D. Tex. Nov. 3, 2010). Default judgment is available "when the adversary process has been halted because of an essentially unresponsive party . . . [as] the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights." *Jackson v. Beech*, 636 F.2d

831, 836 (D.C. Cir.1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C.Cir.1970)).

Although there is a general policy favoring decisions on the merits, if potential claimants fail to respond to a complaint, "a decision on the merits is impractical, if not impossible." *United States v. Approximately $45,860 in U.S. Currency*, No. 14-CV-03801-JCS, 2015 WL 1387468, at *4 (N.D. Cal. Mar. 24, 2015). "A denial of default judgment would prejudice the government in that it would be required to expend further time and effort in an action where no claimants [] have appeared. Without a default judgment, the government may be without recourse altogether." *United States v. Real Prop. & Improvements Located at 929 Clay St., Unit #7, San Francisco, CA*, No. 15-CV-00010-JD, 2015 WL 3547256, at *3 (N.D. Cal. June 5, 2015).

The court's primary inquiry when considering default is whether notice has been adequately served, and whether any party filed a timely claim. *See United States v. $4,620 in U.S. Currency*, 779 F. Supp. 2d 65, 67 (D.D.C. 2011) (default was appropriate because the government "provided sufficient notice of the seizure of the defendant property," and no party filed a timely claim); *see also United States v. Remington, Model 58, 12 Gauge Shotgun, SN: £9181V*, No. 1:11-CV-330, 2012 WL 1466684, at *1 (E.D. Tex. Feb. 7, 2012), report and recommendation adopted, No. 1:11-cv-330, 2012 WL 1466682 (E.D. Tex. Apr. 26, 2012) (default judgment entered upon showing government's compliance with Supplemental Rule G(4)); *United States v. 1999 Lexus GS400*, No. C 05–1139, 2007 WL 1056791, *2-3 (N.D. Cal. 2007) ("Default may be entered upon a showing that: (a) notice has been given as required by Admiralty Local Rule 6–1; (b) the time to answer has expired; and (c) no one has appeared to claim the property.").

Assuming proper notice, the court's second consideration before entering default judgment is whether the complaint establishes a reasonable belief of forfeitability. *See United States v.*

*$1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, No. 17-cv-01166, 2018 WL 3949962, at *4 (D.D.C. June 29, 2018) (*citing United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008), report and recommendation adopted, No. 17-CV-1166, 2018 WL 3941949 (D.D.C. Aug. 15, 2018). "Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint." *Boland v. Smith & Rogers Constr. Ltd.*, 201 F. Supp. 3d 144, 147 (D.D.C. 2016); *see also Int'l Painters & Allied Trades Indus. Pension Fund v. Dettrey's Allstate Painting, LLC*, 763 F. Supp. 2d 32, 34 (D.D.C. 2011) (same) (citing *Adkins v. Teseo*, 180 F.Supp.2d 15, 17 (D.D.C. 2001) (same)). A court must treat "the factual allegations in a complaint, other than those as to damages . . . as conceded by the defendant." *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 (3d Cir.2005); *see also Int'l Painters & Allied Trades Indus. Pension Fund v. R. W. Amrine Drywall Co., Inc.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002) (the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint" upon entry of default by the clerk) (citation omitted).

## ARGUMENT

### I.   The United States Is Entitled To Entry Of A Default Judgment Against The Defendant Properties

The Clerk of Court properly entered default the Defendant Properties, pursuant to Rule 55(a), upon the United States' showing that these defendants and any related claimants failed to plead or otherwise defend this action. *See* Clerk's Entry of Default as to *In Rem* Defendants (ECF 27). Moreover, the well-pleaded allegations of the Complaint establish *prima facie* forfeitability of the Defendant Properties.   Thus, default judgment is appropriate. *See United States v. 8 Gilcrease Lane, Quincy, Fla. 32351,* 638 F.3d 297, 299 (D.C. Cir. 2011) (upholding district court's order for default judgment and final order of forfeiture, because there were no valid claims); *United States v. $9,928.00 in U.S. Currency*, 10-cv-1728, 2012 WL 1004873, at *1 (D.D.C. Mar. 27,

2012) (ordering default where government submitted affidavit certifying that it gave appropriate notice and that no claims were filed); *United States v. $4,620 in U.S. Currency*, 779 F. Supp. 2d 65, 67 (D.D.C. 2011) (ordering default where court struck sole claimant's claim, leaving no claimants to the defendant funds).

A. This Court Has Jurisdiction Over the Overseas Defendant Properties

This Court does not need constructive or actual possession in order to have *in rem* jurisdiction over Defendant Property 1 and Defendant Property 2, which are located overseas. *United States v. Approximately $1.67 Million In Cash*, 513 F.3d 991, 998 (9th Cir. 2008) ("We find ourselves in agreement with the analysis of the D.C. and Third Circuits. The plain language and legislative history of the 1992 amendments makes clear that congress intended § 1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res."). "The language of 28 U.S.C. § 1355(b)(2) makes clear: 'wherever property subject to forfeiture under the laws of the united states is located in a foreign country . . . An action or proceeding for forfeiture may be brought in . . . The United States District Court for the District of Columbia.'" *Id.* That is, "[t]his court is the sole jurisdiction where such litigation is properly lodged. 28 U.S.C. § 1355(b)(2)." *One Gold Ring*, 2019 WL 5853493, at *1. "[C]ongress intended the District Court for the District of Columbia . . . To have jurisdiction to order the forfeiture of property located in foreign countries." *United States v. All Funds in Account in Banco Espanol de Credito*, 295 F.3d 23, 27 (D.C. Cir. 2002). "Whether or not a foreign government will ultimately choose to comply with a judicial forfeiture order 'determines only the effectiveness of the forfeiture order of the district courts, not their jurisdiction to issue those orders." *United States v. One Gulfstream Jet Aircraft*, 941 F. Supp. 2d 1, 7 (D.D.C. 2013) (quoting *Banco Espanol*, 295 F.3d at 26; *see also United States v. Approximately $1.67 Million in Cash*, 513 f.3d 991, 998 (9th Cir. 2008) ( "the

plain language and legislative history of [28 U.S.C. § 1355] makes clear that congress intended §1355 to lodge jurisdiction in the district courts without reference to constructive or actual control of the res."); *Contents of Account Number 03001288 v. United States*, 344 F.3d 399, 405 (3d Cir. 2003) (noting that the foreign country's "compliance and cooperation with this forfeiture determines only the effectiveness of the district court's order, not its jurisdiction to issue that order").  Thus, this Court has *in rem* jurisdiction to issue a forfeiture order, regardless of whether the Iranian, Syrian, or Gibraltarian government or any other authorities comply with any subsequent or prior request for restraint of the property.  *See United States v. All Assets Held at Bank Julius Baer*, 772 F. Supp. 2d 205, 211 (D.D.C.2011) (rejecting the claimant's argument that a foreign government's potential refusal to obey a court-issued forfeiture order diminishes the government's Article III standing).

    B.  <u>The United States Has Satisfied its Notice Obligations to these Defendants.</u>

The United States must send direct notice "to any person who reasonably appears to be a potential claimant on the facts known to the government" and publish public notice as well. Supp. Rule G(4)(b)(i).  "Reasonable notice" requires only that the government attempt to provide actual notice, but it does not require proof that the notice was received.  *See Valderrama v. United States*, 417 F. 3d 1189, 1197 (11th Cir. 2005); *United States v. Funds Up to & including the Amount of $56,634 in U.S. Currency on Deposit in Banesco Int'l, Panama*, 79 F. Supp. 3d 112, 114 (D.D.C. 2015) (notice was adequate based on public notice on the government's forfeiture website).  Where "the government attempted to provide notice and heard nothing back indicating that anything had gone awry, courts have found the government's efforts comply with due process." *Lewis v. United States*, No. 14-cv-496, 2014 WL 6065538, at *6 (S.D. Cal. Nov. 3, 2014) (citing *Jones v. Flowers,* 547 U.S. 220, 226 (2006)).

Direct notice via mail was impossible as to Defendant Property 1 and Defendant Property 2, as the potential claimant was an Iranian government entity.  However, the Iranian government had actual notice and commented in the press about the instant complaint.  *See* https://www.baltimoresun.com/gibraltar-rejects-us-pressure-hold-iranian-oil-tanker-story.html ("The Iranian spokesman warned Monday against any order by the U.S. Justice Department to have the renamed ship seized again.").  "A potential claimant who had actual notice of a forfeiture action may not oppose or seek relief from forfeiture because of the government's failure to send the required notice." Supp. Rule G(4)(b)(iv).

As to Defendant Property 3, there was no person who reasonably appeared to be a potential claimant.  The funds were frozen by an intermediary bank that expressed no interest in contesting the forfeiture.  Neither Paradise Global nor its counterparty to the blocked transaction can be potential claimants as they have no cognizable interest in this property.  A claimant's interest is "'defined by the law of the State in which the interest arose.'" *United States v. Sum of Three Hundred Nine Million Five Hundred Thousand Dollars*, 85 F. Supp. 3d 111, 116 (D.D.C. 2015) (quoting *United States v. One Lincoln Navigator*, 328 F.3d 1011, 1013 (8th Cir. 2003)).  New York law applies here, as a correspondent bank branch located in New York froze Defendant Property 3.  Article 4 of the New York Uniform Commercial Code ("N.Y. UCC") governs such transactions. *Levin v. JPMorgan Chase Bank, N.A.*, 751 F. App'x 143, 147 (2d Cir. 2018).  The blocked asset "is considered the 'sole property' of the correspondent bank," *id.* at 149.  That is, pursuant to N.Y. UCC Article 4, blocked funds in the possession of a correspondent bank are "neither the property of the originator nor the beneficiary," *id.* at 147.  As such, neither Paradise Global nor its counterparty were potential claimants warranting direct service.

Ultimately, the United States satisfied its notice obligations by publishing its action on the government's forfeiture website. [3] *See Johnson v. United States*, No. 1:03-CV-00281, 2004 WL 2538649, at *4 (S.D. Ind. Oct. 22, 2004). "[T]he government may satisfy due process with mere publication of a forfeiture notice when the government does not know or reasonably cannot discover the claimant's whereabouts." *Id.*

C. Default Judgment Is Appropriate Because the Complaint Provides a Well-Pleaded Basis for Relief.

The well-pleaded facts in the United States' Complaint establish a reasonable belief of forfeitability on which the Court may enter judgment.  Three independent avenues demonstrate that the Defendant Properties are foreign assets or sources of influence for the IRGC, a designated terrorist organization, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5), and is therefore subject to seizure and forfeiture under 18 U.S.C. § 981(a)(1)(G)(i).[4]

1. The Government establishes a reasonable belief that the Defendant Properties are subject to forfeiture in three different ways.

First, OFAC identified Defendant Property 1 and Defendant Property 2 as blocked property, and previously issued a blocking order as to Defendant Property 3.  This Court may take judicial notice of such action by OFAC.  *See Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012), *aff'd* 560 F. App'x 4 (D.C. Cir. 2014) ("In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), a court may take judicial notice of public records from other

---

[3] The only party who file a claim based on publication ultimately withdrew their claim.  ECF 24.
[4] The Defendant Properties are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in international money laundering, in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 981(a)(C) as the proceeds of sanctions violations; however, the Court need not consider that theory in the alternative, as the property is directly forfeitable under the broad terrorism authorities described above.

proceedings," citing *Covad Commc'ns Co. v. Bell Atl. Co.,* 407 F. 3d 1220, 1222 (D.C. Cir. 2005));

*see also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F. 3d 621, 624 (D.C. Cir.1997) (on motion

to dismiss, court may consider "matters of which [it] may take judicial notice"). Indeed, a blocking

order from OFAC, and related findings are entitled to deference. *See In re 650 Fifth Ave.*, No. 08-

cv-10934, 2013 WL 2451067, at *5–6 (S.D.N.Y. June 6, 2013). "OFAC has been delegated the

authority to administer the SDN listing regime, and the Court must therefore give effect to its

informal adjudications, unless they are 'plainly inconsistent' with the relevant statutes and OFAC

regulations." *Id.*; *Consarc Corp. v. Iraqi Ministry.* 27 F. 3d 695, 702 (D.C. Cir. 1994), citing

*Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 844–45 (1984). "Given OFAC's unique expertise in

matters of terrorist finance and the sensitive nature of the investigations upon which OFAC makes

its determinations, it is entitled to deference even greater than that afforded an administrative

agency statutory interpretation under *Chevron." See In re 650 Fifth Ave.*, 2013 WL 2451067, at

*5–6; *see also Holy Land Found. for Relief & Dev. v. Ashcroft,* 219 F. Supp. 2d 57, 68 (D.D.C.

2002) *aff'd,* 333 F. 3d 156 (D.C. Cir. 2003) (OFAC interpretation of "legally enforceable interest"

entitled to deference). OFAC's blocking of the Defendant Properties is due such deference. This

finding establishes a reasonable belief that the property is subject to forfeiture.

Second, this Court previously found by *probable cause* that the Defendant Properties were

subject to forfeiture. *See* ECF 16. This finding relied on the same facts as alleged in the complaint

and affidavit in support of the warrant for arrest. *See id.* This Court's prior finding mandates a

repeat finding here, particularly given that reasonable belief is a substantially lower standard.

Third, the facts, which must be taken to be true, sufficiently plead a reasonable belief of

forfeitability, because the United States has specified: the victim of the scheme; the perpetrators

of the scheme; the goal of the scheme; the means of effectuating the scheme; and which members

were responsible for which acts.  *See All Assets Held In Account No. XXXXXXXX*, 83 F. Supp. 3d at 373 (listing such factors).  Specifically:

- the perpetrators of the scheme were Iships Management Pte Ltd ("Iships"), a front company which was the manager of Defendant Property 1.  Iships was part of the Avantgarde Group, which was associated with Mohammad Saeed Al Aqili and the Al Aqili Group.  OFAC noted in its designation how Mohammad Saeed Al Aqili and the Al Aqili Group arranged oil sales for the IRGC.  The Al Aquili Group used front companies like Paradise Global to launder related payments.  Iships was also directly affiliated with NIOC, *see e.g.*, Complaint (ECF 14) at ¶¶ 26-30, 48;

- the victims of the scheme were the United States, citizens or residents of the United States, or their property, *see Id.* at ¶ 81;

- the goal of the scheme was to support the IRGC's sanction-evading petroleum shipments to destinations including Syria, the profits of which support the IRGC's full range of nefarious activities, including the proliferation of  WMD and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad, *see* ¶¶ 80, 22;

- the means of effectuating the goals were by concealing the Iranian-origin of the petroleum by engaging in ship-to-ship transfers and fabricating shipping documents, *see e.g.*, ¶¶ 36 - 44; and

- regarding which members of the conspiracy were responsible for which acts:  the IRGC and NIOC   arranged the shipments; and private third-party companies including the Avantgarde Group companies, Iships, and Paradise Global, managed the vessels and paid for shipments, *see e.g.*, ¶¶ 26-30, 48.

2.  The Defendant Properties fall squarely within the two broad categories in
18 U.S.C. § 98l(a)(l)(G)(i)

18 U.S.C. § 98l(a)(l)(G)(i) covers two categories of property relating to any individual, entity, or organization engaged in planning or perpetrating any federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property: (1) all assets, foreign or domestic of such individual, entity, or organization; and (2) all assets, foreign and domestic, affording any person a source of influence over the terrorist entity or organization.  "That is, the statute empowers the government to seek the forfeiture of property outside the United States, which may have never touched the United States. The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations." *United States v. One Gold Ring with Carved Gemstone*, No. 16-CV-02442-TFH, 2019 WL 5853493, at *1 (D.D.C. Nov. 7, 2019).  Defendant Property 1 and Defendant Property 2 fall into the first prong, and Defendant Property 3 falls into the second prong.

"[T]he Court must therefore give effect to [the Secretary of State's] adjudication[]" that the IRGC is a Foreign Terrorist Organization, *see In re 650 Fifth Ave.*, 2013 WL 2451067, at *6. "Foreign Terrorist Organizations [] are foreign organizations that are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act []." https://www.state.gov/foreign-terrorist-organizations/.   Such designations require: a "foreign organization"; that is engaged in "terrorist activity" or "retains the capability and intent to engage in terrorist activity or terrorism;" and such activity or terrorism "must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States." *Id.*

The terrorism forfeiture provision, 18 U.S.C. § 98l(a)(l)(G)(i), cross references 18 U.S.C. § 2332b(g)(5), which defines "a federal crime of terrorism" to include an offense that "is calculated

to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and, *inter alia*, violates 2339B (relating to providing material support to "terrorist organizations").   § 2339B defines "'terrorist organization' [as] an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act," *i.e.*, a designated Foreign Terrorist Organization by the Secretary of State.   18 U.S.C. § 2339B(g)(6).   Thus, once an entity is designated a Foreign Terrorist Organization, it automatically comes within the scope of 18 U.S.C. § 98l(a)(l)(G)(i) as such individual, entity, or organization is necessarily engaged in planning or perpetrating a federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property.  *See United States v. Puerta*, 249 F. App'x 359, 360 (5th Cir. 2007) (defendant's conviction fell squarely within the definition of a "federal crime of terrorism" in § 2332b(g)(5), because he provided material support to a "designated foreign terrorist organization" in violation § 2339B).

Furthermore, OFAC, which has "unique expertise in matters of terrorist finance," *id.*, has tied the financing of terrorism on numerous occasion to petroleum sales by the IRGC.  *See e.g.*, https://home.treasury.gov/news/press-releases/sm767.   OFAC concluded that "in spring 2019 alone, [one] IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil . . . which sold for more than half a billion dollars."  *Id.*  According to OFAC, the proceeds of "[t]his vast oil-for-terror shipping network" fund "violent acts of terrorism," *id.*

  i.  <u>Defendant Property 1 and Defendant Property 2 – Property of the IRGC</u>

Defendant Property 1 and Defendant Property 2 are foreign assets of a designated Foreign Terrorist Organization, and thus subject to forfeiture under the first prong of 18 U.S.C.

§ 98l(a)(l)(G)(i).  As noted in the Complaint and affidavit in support of the warrant for arrest in rem, the IRGC's Deputy Commander Rear Admiral Ali Fadavi and the head of the IRGC's navy, Alireza Tangsiri, both publicly admitted that Defendant Property 1 and Defendant Property 2 belonged to the IRGC.  *See* Complaint (ECF 14) at ¶¶ 33-34.  Moreover, OFAC's findings independently establish Defendant Property 1 and Defendant Property 2 are foreign assets of the IRGC.  On August 30, 2019, OFAC identified Defendant Property 1 and Defendant Property 2 as blocked properties, because of their nexus to the IRGC-QF.  Under Secretary for Terrorism and Financial Intelligence Sigal Mandelker stated, "Vessels like [Defendant Property 1] enable the IRGC-QF to ship and transfer large volumes of oil, which they attempt to mask and sell illicitly to fund the regime's malign activities and propagate terrorism." https://home.treasury.gov/news/press-releases/sm765.  Defendant Property 1 and Defendant Property 2 are thus forfeitable as foreign assets of a Foreign Terrorist Organization.

ii.    Defendant Property 3 – "Source of Influence" over the IRGC

Defendant Property 3 is a domestic asset owned by Paradise Global affording a person (*i.e.*, Paradise Global) a source of influence over a terrorist organization (*i.e.*, the IRGC).  The ambit of 18 U.S.C. § 981(a)(1)(G)(i) reaches beyond all assets of the terrorist organization (prong 1) to assets of a third party that create a "source of influence" over the terrorist organization (prong 2).  Although there is a dearth of case law about the latter provision, the RICO forfeiture statute, 18 U.S.C. § 1963(a), uses similar "source of influence" language.  "No definition of the term 'interest' appears in RICO."  *United States v. Martino*, 681 F.2d 952, 955 (5th Cir. 1982).  "The common or dictionary definition of the term includes 'right, title, or legal share in something; participation in advantage, profit, and responsibility.'"  *Id.* (quoting Webster's Third New International Dictionary 1178 (1971)).  In RICO-based forfeitures, properties that created a "source of influence" were ones

that were "used to further the affairs of the enterprise," or "made the prohibited conduct less difficult or more or less free from obstruction or hindrance." *United States v. Neff*, 303 F. Supp. 3d 342, 349 (E.D. Pa. 2018) (internal quotation marks and citation omitted).  Ultimately, the term must encompass a category of property distinct from those already covered by the statute.  *Id.* (defendant's interpretation of RICO forfeiture statute wrongly made "source of influence" surplusage by making it co-extensive with related forfeiture provision that covered the same category of property).

Paradise Global's role as a front company for the private individuals involved in this scheme provided a "façade of legitimacy" that helped to conceal the scheme to sell Iranian petroleum. *United States v. Gjeli*, No. CR 13-421-1, 2019 WL 8373425, at *7 (E.D. Pa. Nov. 25, 2019) ("façade of legitimacy" was source of influence).  At bottom, Paradise Global was the vehicle by which the co-conspirators made surreptitious payments.  Vehicles, literal and metaphorical, afford a source of influence as they present a way to move people (cars), petroleum (ships), and money (front companies) without detection.  *See Gjeli*, 2019 WL 8373425, at *8 (vehicle, which was purchased with "clean" funds, was still forfeitable as a source of influence because it was used to transport people to meetings that promoted the RICO enterprise).

While the IRGC does not hold an ownership interest in Defendant Property 3, the façade of legitimacy afforded by Paradise Global provided a source of influence over the IRGC.  As OFAC noted, the IRGC relies on such sales to fund its terrorism campaign.  OFAC further noted that the IRGC-QF relies on third party shipping networks, which feature dozens of ship managers, vessels, and facilitators, to move petroleum products.  *See* https://home.treasury.gov/news/press-releases/sm767.  "This complex network of intermediaries enables the IRGC-QF to obfuscate its involvement in selling Iranian oil."  *Id.*  OFAC's statements, which are due deference from the

Court, demonstrated that the co-conspirators "used [Paradise Global] to further the affairs of the enterprise," and that Paradise Global "made the [IRGC's] prohibited conduct [by sanctions] less difficult or more or less free from obstruction or hindrance."  *Neff*, 303 F. Supp. 3d at 349.  Thus, although Defendant Property 3 is not the property of the IRGC, it is still forfeitable as an asset that provided a source of influence by Paradise Global over the IRGC.

## CONCLUSION

For the foregoing reasons, and, upon consideration of the record in this case, including a showing of compliance with applicable rules regarding service of process and notice by publication, the default entered by the Clerk of the Court, and taking the well-pleaded allegations of the Complaint as true, the United States respectfully requests that its motion for entry of default judgment be granted.  A proposed order accompanying the Motion is attached.

Respectfully submitted,

MICHAEL R. SHERWIN, N.Y. Bar 4444188
ACTING UNITED STATES ATTORNEY


By:           /s/ *Zia Faruqui*
ZIA M. FARUQUI, D.C. Bar No. 494990
BRIAN P. HUDAK
Assistant United States Attorneys
555 Fourth Street, NW
Washington, DC 20530
(202) 252-7566 (main line)

*Attorneys for the United States of America*


Date: June 30, 2020